UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EDDIE ALLEN JACKSON,

                    Petitioner,

v.                                     CASE NO. 07-14328
                                     HONORABLE NANCY G. EDMUNDS
BLAINE LAFLER,

                    Respondent.

_____/

**OPINION AND ORDER DENYING HABEAS CORPUS PETITION,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,
BUT GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

      Petitioner Eddie Allen Jackson has filed a *pro se* habeas corpus petition pursuant

to 28 U.S.C. § 2254.  The petition challenges Petitioner's convictions for assault with intent

to do great bodily harm less than murder and three weapon offenses.  Petitioner alleges

that (1) he was denied his right to an impartial jury, (2) the jury's verdict was not supported

by sufficient evidence, and (3) the prosecutor failed to use due diligence in locating the

complaining witness.  Respondent Blaine Lafler urges the Court through counsel to deny

the petition on the grounds that Petitioner's first two claims lack merit and his third claim

is procedurally defaulted and not cognizable on habeas corpus review.  The Court agrees

that Petitioner is not entitled to the relief he seeks.  Therefore, his petition will be denied.

**I.  Background**

      Petitioner was charged in Kent County, Michigan with assault with intent to commit

murder, carrying a concealed weapon, felon in possession of a firearm, and possession of

a firearm during the commission of a felony.  The facts leading to these charges have been

summarized by the Michigan Court of Appeals as follows:

> On June 1, 2004, Michael Sterling observed defendant drive into the parking lot of a gas station and speak with Montery Sterling, defendant's cousin.  Later, Montery informed Michael that his conversation with defendant involved drugs. After the Sterlings left the gas station, they drove to a house located on Bates Street.  Shortly after their arrival, defendant parked on the street, got out of his car, and "called Montery over" to him. Defendant and Montery began "arguing and cussing" and Montery punched defendant's face. As defendant staggered backward from the blow, he pulled out a gun and shot at Montery.  Montery ran away but defendant continued shooting.  Michael recalled defendant firing a total of three to five shots at Montery.
>
> Tanya Kirkland and Vernon Simmons also observed defendant shoot at Montery. According to Kirkland, when defendant and Montery began arguing, defendant punched Montery, and only then did Montery punch defendant.  Defendant subsequently removed a gun from the "pouch in his hoodie" and shot at Montery approximately two times.  As Montery ran away, defendant shot at him approximately three more times.  Simmons testified that he saw Montery and defendant argue.  Montery knocked defendant to the ground, and Simmons subsequently heard three to four gunshots.  He saw Montery run away.
>
> At trial, defendant testified that, at the gas station on the morning of the shooting, he asked Montery "what he was selling."  Montery replied, "quarters [of marijuana] for 40 dollars."  Defendant said, "Let me get one of those.... I got 30." Montery refused to sell defendant the marijuana and said, "If you come up with the rest of the change, I be on Bates [Street], and just come holler at me."  Later that day, defendant drove to Bates Street to talk to Montery.  Defendant approached Montery and said, "I got 35 dollars, let me slide the five dollars." Montery replied, ". . . I ain't selling you [s-t] because I heard you was working with the [the police]."  Defendant said, "Man, that's [f---ed] up because we supposed to be family."  Montery asked, "What you say?"  And as defendant turned, to respond to the question, Montery punched him in the face.  Defendant stumbled backwards, removed his gun from his pants, and shot at Montery. Defendant did not recall how many times he fired the gun, but testified that it was more than twice.  He claimed that he stopped firing when Montery started running.

*People v. Jackson*, No. 264363, 2007 WL 517364, at *1 (Mich. Ct. App. Feb. 20, 2007).

On May 26, 2005, a Kent County Circuit Court jury found Petitioner guilty of the

lesser-included offense of assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84.  The jury also found Petitioner guilty, as charged, of felon in possession of a firearm, Mich. Comp. Laws § 754.224f, carrying a concealed weapon, Mich Comp. Laws § 750.227, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b.  The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent prison terms of five to fifteen years for the assault conviction, two to seven and a half years for being a felon in possession of a firearm, and two to seven and a half years for carrying a concealed weapon.  The Michigan Court of Appeals affirmed Petitioner's convictions, and on May 30, 2007, the Michigan Supreme Court denied leave to appeal.  *See People v. Jackson*, 478 Mich. 873; 731 N.W.2d 735 (2007).  Petitioner filed his habeas corpus petition on October 11, 2007.

## II.  Standard of Review

Petitioner is entitled to the writ of habeas corpus only if the state court's adjudication of his claims on the merits –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)

3

(Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

## III. Discussion

### A. The Jury Venire

Petitioner, who is an African American, was tried by a jury composed of all Caucasians. He alleges that he was deprived of an impartial jury because his jury venire was not drawn from a fair cross-section of the community. The Michigan Court of Appeals determined on review of this claim that Petitioner failed to establish a *prima facie* violation of the Sixth Amendment to the United States Constitution.

The Sixth Amendment guarantees defendants in criminal cases "the right to . . . an impartial jury of the State and district wherein the crime shall have been committed . . . ." This right

> includes the right to a jury drawn from a "fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 526 & 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). As the Supreme Court has emphasized, however, there is "no requirement that petit juries *actually chosen* must mirror the community." *Id.* at 538, 95 S. Ct. 692 (emphasis added). "Defendants are not entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (citations omitted).

*United States v. Forest*, 355 F.3d 942, 953 (6th Cir. 2004).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

4

(3) that this underrepresentation is due to systematic exclusion of the group
in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

### 1. Distinctive Group; Fair and Reasonable Representation

Petitioner has satisfied the first prong of the Duren test, because African Americans are a distinctive group. *Smith v. Berghuis*, 543 F.3d 326, 336 (6th Cir. 2008) (citing *Peters v. Kiff*, 407 U.S. 493, 503 (1972)), *cert. granted*, __ S. Ct. __, 2009 WL 1370175 (U.S. Sept. 30, 2009) (No. 08-1402).  The second prong of *Duren* requires showing that the representation of African Americans in Petitioner's venire was not fair and reasonable. Under the absolute disparity test, which was applied in this case, the petitioner must compare "the members of a distinctive group that are jury eligible with those that appear on the venire." *Id.* at 337.

The record in this case indicates that there were forty-five people in Petitioner's jury pool and two of them, or 4.4%, were African Americans.  Defense counsel objected to the composition of the venire after the jury was selected, but before the jury was sworn.  He asked the trial court to re-open the *voir dire* proceeding to increase the minority representation and to make the panel more representative of the community.  The trial court denied defense counsel's request after noting that the percentage of African Americans in the overall population was 8% to 9%.  (Tr. May 23, 2005, at 118-21.)

Petitioner raised the same issue in a post-conviction motion for new trial.  At a hearing on his motion on January 27, 2006, his attorney pointed out that there were 8.9% African Americans in Kent County as of the last census and that African Americans constituted only 4.4% of Petitioner's jury pool.  Defense counsel pointed out that the jury

5

pool had less than 50% of the distinctive group in the community.  The trial court responded to counsel's argument by stating that, in the past, the circuit court had aggressively addressed the problem of minority representation in jury venires and that minorities comprised only 8% to 9% of the pool from which the court chose jurors.  The trial court denied Petitioner's motion for new trial after stating that the circuit court had done everything it could to address the concerns Petitioner raised.  The court also stated that the method for choosing jurors did not systematically exclude minorities.  (Mot. Hr'g Jan. 27, 2006, at 5-17.)

In his habeas petition, Petitioner appears to be comparing the percentage of African Americans in Kent County with the percentage of African Americans in his venire.  He is required to compare the percentage of *jury-eligible* minorities in the community with the percentage of minorities in the jury venire.  *Forest*, 355 F.3d at 954.  Even if Petitioner meant to compare the percentage of jury-eligible African Americans with those in his venire, he has failed to show that the representation of African Americans on Kent County venire panels was consistently unfair and unreasonable.  He has alleged nothing more than that the representation of African Americans in his venire was not fair and reasonable.

### 2.  Systematic Exclusion

Petitioner also has failed to show that there was systematic exclusion of African Americans in Kent County venires.  "The Supreme Court has described 'systematic exclusion' to mean exclusion 'inherent in the particular jury-selection process utilized.'" *Smith*, 543 F.3d at 339 (quoting *Duren*, 439 U.S. at 366).  A habeas petitioner need not show intentional discrimination or unequivocal proof of systemic exclusion; instead, "the proof must be sufficient to support an inference that a particular process results in the

6

underrepresentation of a distinctive group." *Id.* at 339, 342-43.

"In *Duren*, the underrepresentation was evident in every weekly venire for a period of nearly a year. Continued underrepresentation made it evident that such underrepresentation was systematic or 'inherent in the particular jury-selection process utilized.'" *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir. 1988) (quoting *Duren*, 439 U.S. at 366). And in *Smith*, the petitioner demonstrated that African Americans were underrepresented on Kent County venire panels by 15% to 18% over a period of seventeen months and 34% in the month during which his jury was drawn.

Petitioner has alleged only that African Americans were underrepresented in his venire. He relies on the fact that the trial court acknowledged past problems in making jury venires representative of the community. He has provided no specific information about the typical jury venire in Kent County in the months before and after his trial or even in the month during which his jury venire was drawn. There is no evidence that the exclusion of African Americans from his venire was systematic.

In conclusion, Petitioner has failed to satisfy the second and third prongs of the *Duren* test. Thus, he has not alleged a *prima facie* violation of the fair cross-section provision of the Sixth Amendment, and he is not entitled to relief on the basis of his first claim.

### B. Sufficiency of the Evidence

Petitioner alleges next that the jury's verdict on the assault count was based on legally insufficient evidence. According to Petitioner, the prosecutor failed to show that he intended to kill the victim and did not act in self defense. The Michigan Court of Appeals held that the evidence presented at trial was sufficient to sustain Petitioner's conviction.

7

### 1.  Legal Framework

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  After *Winship*, the critical question on review of the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

In Michigan, "[t]he elements of assault with intent to do great bodily harm less than murder are (1) an assault, i.e., 'an attempt or offer with force and violence to do corporal hurt to another' coupled with (2) a specific intent to do great bodily harm less than murder." *People v. Bailey*, 451 Mich. 657, 668-669; 549 N.W.2d 325, 331 (1996) (citing *People v. Smith*, 217 Mich. 669, 673; 187 N.W. 304, 305  (1922)).  The Michigan Court of Appeals "has defined the intent to do great bodily harm as 'an intent to do serious injury of an aggravated nature.'"  *People v. Brown*, 267 Mich. App. 141, 147; 703 N.W.2d 230, 236 (2005) (quoting *People v. Mitchell*, 149 Mich. App. 36, 39; 385 N.W.2d 717, 718 (1986)). "'Circumstantial evidence and reasonable inferences arising from the evidence can constitute satisfactory proof of the elements of a crime.'"  *People v. Carines*, 460 Mich. 750, 757; 597 N.W.2d 130, 135 (1999) (quoting *People v. Allen*, 201 Mich. App. 98, 100; 505 N.W.2d 869, 871 (1993)).

### 2.  Application

8

An assault was established when Petitioner admitted at trial that he shot Montery Sterling two times.  Although he denied having an intent to kill Montery, his intent to do great bodily harm can be inferred from the shooting.  *See People v. Ray*, 56 Mich. App. 610, 615; 224 N.W.2d 735, 737 (1974) ("The use of a lethal weapon will support an inference of an intent to kill.").

Petitioner claims that prosecution witnesses gave inconsistent and false testimony, but "[a]n assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims."  *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).  "[A]ttacks on witness credibility are simply challenges to the *quality* of the government's evidence and not to the sufficiency of the evidence."  *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984) (emphasis in original).

Petitioner also contends that the prosecutor failed to prove he did not act in self defense.  Petitioner testified at trial that he fired at Montery to prevent Montery from harming him.  The grounds for his fear were that Montery had been involved in a lot of fights, that Montery and his family "jumped" people on occasion, and that Montery once showed him a gun.  (Tr. May 25, 2005, at 71-73.)

A person is justified in using deadly force against another person if the person "honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm."  *People v. Heflin,* 434 Mich. 482, 502; 456 N.W.2d 10, 18 (1990).  "Once evidence of self-defense is introduced, the prosecutor bears the burden of disproving it beyond a reasonable doubt."  *People v. Fortson,* 202 Mich. App. 13, 20; 507 N.W.2d 763, 767 (1993).  However,

> A participant in voluntary mutual combat will not be justified in taking the life of another until he is deemed to have retreated as far as safely possible.  One who is involved in a physical altercation in which he is a willing participant . . . is *required* to take advantage of any reasonable and safe avenue of retreat before using deadly force against his adversary, should the altercation escalate into a deadly encounter.

*People v. Riddle*, 467 Mich. 116, 120; 649 N.W.2d 30, 35 (2002) (footnote omitted) (emphasis in original).  Furthermore, "an act committed in self-defense but with excessive force or in which [the] defendant was the initial aggressor does not meet the elements of lawful self-defense."  *Heflin,* 434 Mich. at 509, 456 N.W.2d at 21.

Tanya Kirkland testified that Petitioner struck Montery before Montery punched Petitioner (Tr. May 24, 2005, at 38), and Michael Sterling testified that Montery did not have a gun or any kind of weapon during the incident (*Id.* at 74, 77-78, 87).  Petitioner himself admitted at trial that he pulled out a gun and started to shoot even though he did not see a gun, knife, or other weapon on Montery.  (Tr. May 25, 2005, at 97-99.)  And, according to witnesses, he  continued to fire his gun at Montery as Montery ran away.  (Tr. May 24, 2005, at 39, 48, 69.)  There was additional evidence that Petitioner said, "Take that for hitting my cousin," after the shooting.  (*Id.* at 108-09.)  This comment suggested that the shooting was motivated by revenge, not fear.

A rational juror could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner assaulted the victim with an intent to do serious injury of an aggravated nature.  A rational juror also could have concluded that Petitioner did not act in lawful self defense, either because he was the initial aggressor or because he failed to retreat before using deadly force.  Therefore, the state appellate

10

court's conclusion that the evidence was sufficient to support the jury's verdict did not

result in an unreasonable application of *Jackson*.

**C.  The Failure to Produce the Complaining Witness;
       Defense Counsel's Failure to Object**

The third and final claim alleges that the prosecution failed to use due diligence in

locating Montery Sterling.  Petitioner claims that the prosecution's failure to produce

Montery at trial resulted in a violation of his right to confront witnesses and his right to

compulsory process.  Petitioner further alleges that his trial attorney was ineffective for

failing to object to the prosecution's lack of due diligence and for failing to request a

missing-witness instruction.[1]

**1.  The State Law Issue**

In Michigan,

> A prosecutor who endorses a witness under MCL 767.40a(3) is
> obliged to exercise due diligence to produce that witness at trial.  *People
> v. Cummings,* 171 Mich. App. 577, 583-585; 430 N.W.2d 790 (1988).  A
> prosecutor who fails to produce an endorsed witness may show that the
> witness could not be produced despite the exercise of due diligence.
> *People v. Canales,* 243 Mich. App. 571, 577, 624 N.W.2d 439 (2000).  If
> the trial court finds a lack of due diligence, the jury should be instructed
> that it may infer that the missing witness's testimony would have been
> unfavorable to the prosecution's case.  CJI2d 5.12; see also *People v.*

---

[1]  Respondent argues that this claim is procedurally defaulted because the
Michigan Court of Appeals reviewed the claim for "plain error" and stated that Petitioner
did not properly preserve his claim by raising the issue at trial.  The Court will excuse
the procedural default because Petitioner's claim lacks merit, and a federal habeas
court need not address a procedural-default issue before deciding against the petitioner
on the merits.  *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (quoting *Hudson v.
Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518,
525 (1997)), *cert. denied*, __ U.S. __, 129 S. Ct. 1986 (2009).

*Snider,* 239 Mich. App. 393, 422; 608 N.W.2d 502 (2000).

*People v. Eccles*, 260 Mich. App. 379, 388-389; 677 N.W.2d 76, 83 (2004) (end footnote omitted).  "Due diligence is the attempt to do everything reasonable, not everything possible, to obtain the presence of res gestae witnesses."  *People v. George*, 130 Mich. App. 174, 178; 342 N.W.2d 908, 910 (1983).

To the extent that Petitioner is alleging a violation of state law, as summarized above, his claim is not cognizable here.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  A federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

### 2.  The Constitutional Claims

Petitioner's federal constitutional claim alleges a violation of his right to confront witnesses and his right to compulsory process for obtaining witnesses in his favor. "There is no clearly established Supreme Court law recognizing a constitutional right to a res gestae witness," *Grays v. Lafler*, 618 F. Supp.2d 736, 745 (W.D. Mich. 2008), and the Confrontation Clause is not implicated when, as here, the prosecution did not use the witness's testimony at trial, in either live or recorded form.  *United States v. Colin*, 928 F.2d 676, 679 (5th Cir. 1991).  There simply is no right to confront a "witness" who provides no evidence at trial.  *United States v. Heck*, 499 F.2d 778, 789 n. 9 (9th Cir. 1974).

The Compulsory Process Clause, however, guarantees a criminal defendant with

12

"the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt."  *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).  Although the Clause does not guarantee the actual attendance of witnesses sought by the defense, the prosecution must "exercise due diligence in a good faith effort to secure the attendance of subpoenaed witnesses."  *United States v. Barker*, 553 F.2d 1013, 1022 (6th Cir. 1977). Of course, the witnesses must have been "both material and favorable to [the] defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  A defendant cannot establish a violation of the constitutional right to compulsory process merely by showing that he or she was deprived of a witness's testimony.  *Id.*

In this case, the police served a subpoena on Michael Sterling, who handed the subpoena to his nephew Montery Sterling.  Michael also informed the police that Montery was staying with his girlfriend in an apartment complex at the intersection of 44th and Kalamazoo Streets.  (Tr. May 24, 2005, at 88-89.)  Detective Mark Worch testified that he collaborated with Michael Sterling in an attempt to contact Montery. Detective Worch talked to Montery over the telephone, but he was unable to locate him. He would have arrested Montery on a material witness warrant had he been able to find him.  (Tr. May 25, 2005, at 43.)  These facts indicate that the police took reasonable steps to locate Montery.

Petitioner nevertheless maintains that Montery would have supported his defense because Montery informed an investigator that he did not want to pursue the

13

case.  Montery also claimed to be unable to identify Petitioner at a lineup, and he stated

that Petitioner probably acted out of fear during the incident in question and probably

thought he was protecting himself.  *See* Habeas Pet., Ex. J.

Montery's comments to the investigator suggest that he might have provided

favorable testimony for the defense had he been produced at trial.  However, if he had

testified in Petitioner's defense, the jury might have concluded that his testimony was

untruthful due to his close relationship to Petitioner and a reluctance to testify against

Petitioner.  Montery's alleged failure to identify Petitioner during a lineup in all likelihood

would not have convinced the jury to acquit Petitioner, because the jury was made

aware that one other witness (Vernon Simmons) was unable to identify Petitioner.  (Tr.

May 24, 2005, at 110).

Furthermore, the evidence against Petitioner was overwhelming.  Michael

Sterling knew Petitioner all his life, and he identified Petitioner at trial as the shooter.

(*Id.* at 60 & 68).  Tanya Kirkland also was certain that Petitioner shot Montery even

though she did not know Petitioner's name before going to court.  (*Id.* at 53.)  Petitioner

himself admitted to shooting Montery, and his self-defense theory was weak.

The Court concludes for the foregoing reasons that Petitioner was not deprived

of a witness that was both material and favorable to the defense.  Therefore, his

constitutional right to compulsory process was not violated.  And because defense

counsel could have reasonably concluded that Montery would not have been a

favorable witness for the defense, counsel was not ineffective for failing to object to the

prosecution's failure to produce Montery.  Although defense counsel may have been

14

remiss for not requesting a missing-witness instruction, there is not "a reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Consequently, the alleged error did not rise to the level of ineffective assistance of counsel.

## IV. Conclusion

The state appellate court's decision was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt. #1] is **DENIED**.

Reasonable jurists would not disagree with the Court's resolution of Petitioner's constitutional claims nor conclude that the issues presented warrant encouragement to proceed further. Accordingly, the Court declines to issue a certificate of appealability on any of Petitioner's claims. *Banks v. Dretke*, 540 U.S. 668, 674 (2004) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). Petitioner, however, may proceed *in forma pauperis* on appeal because his issues are arguable on the merits, and an appeal could be taken in good faith. Fed. R. App. P. 24(a)(4)(B); *Foster v. Ludwick*, 208 F. Supp.2d 750, 764-65 (E.D. Mich. 2002).

s/Nancy G. Edmunds

15

Nancy G. Edmunds
United States District Judge

Dated:  November 3, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 3, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager